## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BRENT WALDREP, individually and on behalf
of similarly situated persons defined herein,

**Case No.  2:21-cv-12590**

Plaintiff,

v.

EQUITYEXPERTS.ORG, LLC,

**TRIAL BY JURY DEMANDED**

Defendant.

## COMPLAINT-CLASS ACTION

## INTRODUCTION

1.     Plaintiff Brent Waldrep ("WALDREP"), whom timely pays his Paramount Estates of Auburn Hills ("PARAMOUNT") annual association dues in full, e.g. (Exhibits A, B), brings this action individually, and on behalf of similarly situated persons defined herein, alleging a high pressure, rapidly increasing collection fees, fraudulent, collection scheme engaged in by Defendant Equityexperts.org, LLC ("EQUITY EXPERTS") whom collected from WALDREP and the putative class members: (a) collection fees that are not permitted under the governing bylaws as they are not actual attorney's fees "incurred" or costs of collection "incurred" by the association; (b) alternatively, EQUITY EXPERTS's collection fees are excessive.

2.     EQUITY EXPERTS's business model thrives upon the greed and laziness of the property managers whom EQUITY EXPERTS engages to allow EQUITY EXPERTS to take over the property managers' collections activities, charge the collection fees that EQUITY EXPERTS's thinks it can get away with, and in exchange EQUITY EXPERTS gives those property managers as a "kick back", the principal amount of the association's debt it collects from the unit owner, monies that the unit owner was to have paid the property manager directly as annual dues or fines.

3.     EQUITY EXPERTS's initial March 10, 2021 collection letter added a collection fee of $270 to the principal amount of the alleged debt, followed by an April 30, 2021 letter indicating that a collection fee of $350 was added to the balance being sought by EQUITY EXPERTS and contained the statement that, "Your case has not been referred to an attorney and legal proceedings have not been started at this time, but we intend to do so if the debt is not paid", followed by three more letters, and a letter on June 3, 2021, another letter stating, "If you do not call and either pay the debt or agree to a payment plan within seven (7) days, we will escalate your file to our Post Outreach Lien Enforcement process.  If we escalate your file, an additional $650.00 collection fee will . . . be added to your account."

4.     In just ninety (90) days, EQUITY EXPERTS's collection fees it claims it can collect from WALDREP directly totaled one thousand two hundred seventy dollars ($1,270).

5.     The underlying principal debt in this case involves a disputed legal fee of $300.00 that PARAMOUNT itself incurred with and paid to Makower Abbate Guerra Wegner Vollmer, on or around December 2019, not related to any enforcement action against WALDREP to, "enforce[] any of the restrictions or rules and regulations may be assessed to and collected from the responsible Co-owner", but related to advice regarding a 1 foot by 4 foot sign, a similar sign WALDREP had permission from the PARAMOUNT in the past to post and a sign WALDREP believed under PARAMOUNT's Rules and Regulation, May 2011 Revised Article VI-10 Signs-Yard Signs, WALDREP could post for a one-time event was "permitted without approval", and for speaking with WALDREP's legal counsel, Ms. Hughes.

6.     After WALDREP and his other legal counsel, Ms. Sexton, on WALDREP's behalf, attempts disputing the alleged debt EQUITY EXPERTS was attempting to collect from WALDREP, including EQUITY EXPERTS's claimed collection fees and collection fees added after the June 3, 2021 letter, were unsuccessful, WALDREP felt he had no alternative, and under duress, to pay EQUITY EXPERTS all the moneys EQUITY EXPERTS demanded in order to buy WALDREP peace of mind, avoid having to pay more collection fees that EQUITY

EXPERTS indicated would be forthcoming, and to avoid any potential legal proceeding from being initiated, which could cause WALDREP reputational damage.

7.    On June 21, 2021, EQUITY EXPERTS caused WALDREP's credit card to be charged $1,921.14 for payment of the disputed debt and EQUITY EXPERTS's collection fees.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction under 28 U.S.C. § 1331 (Federal Question), 15 U.S.C. §1692k(d) (FDCPA), 28 U.S.C. § 1367(a) (supplemental jurisdiction), *c.f. Thompke v. Fabrizio & Brook, P.C.,* 2017 U.S. Dist. LEXIS 128359 * 25 (E.D. Mich. Aug 14, 2017) (*citing Glazer v. Chase Home Fin. LLC,* 704 F.3d 453, 463 (6th Cir. 2013)).

9.    This case involves a monetary injury, the payment of EQUITY EXPERTS's challenged collection fees.

10.    WALDREP's claims under 15 U.S.C. § 1692(f)(1) collecting more monies that what is legally owed, bears a sufficiently close relationship to the common law of "unjustifiable-litigation torts," including the tort of malicious prosecution, *Demarais v. Gurstel Chargo, P.A*., 869 F.3d 685, 691 (8th Cir. 2017), sufficient here for Plaintiff and each of the putative class members to meet Article III's case and controversy for standing.

11.    WALDREP's claims of common law fraud are so intertwined with and arise out of the same common nucleus of operative fact, as his claims under 15 U.S.C. §§ 1692(f), (f)(1), and does not present a novel question of state law.

12.    Venue is proper because: (a) WALDREP resides in the District; (b) EQUITY EXPERTS' office is located in the District; and (c) EQUITY EXPERTS' conduct complained of occurred within the District.

## PARTIES

13.    WALDREP is a natural person residing in Oakland County, Michigan.

14.    EQUITY EXPERTS is a limited liability company organized under the law of Michigan and its registered agent and the address listed by the State of Michigan Department of Licensing and Regulatory Affairs is, Michael Novak, 2391 Pontiac Road, Auburn Hills, MI 48326.

## NOTICE TO POTENTIAL OTHERS FOR RELATIONBACK PURPOSES AND/OR TO PIERCE THE CORPORATE VEIL

15.    The following persons and/or entities (based on their related ownership and control of EQUITY EXPERTS and receipt of EQUITY EXPERTS' profits directly or indirectly) may have liability for the acts of EQUITY EXPERTS or liability if EQUITY EXPERTS is undercapitalized, or will be substituted into this case if EQUITY EXPERTS denies that it is the entity actually involved in the collection of debts from WALDREP and the putative class members, or was involved directly or indirectly in the collection of debs from WALDREP and the

putative class members: (a) Gar Liebler, a "Visionary" AT EQUITY EXPERTS via his company Liebler Acquisitions, LLC and as a "Chairman and Visionary of a national real estate conglomerate headquartered in Auburn Hills, Michigan" which is believed to include Solomon Real Estate Holdings, LLC, which owns the building, 2391 Pontiac Rd, Auburn Hills, MI 48326, and includes TechCollect, LLC, a Nevada Limited Liability Company, a "partner" of EQUITY EXPERTS whose physical address is the same address as EQUITY EXPERTS, 2391 Pontiac Rd, Auburn Hills, MI 48326; (b) Michel Novak, President of EQUITY EXPERTS and who is responsible for the day-to-day operations of EQUITY EXPERTS, and is employed by Hael, L.L.C. in his position at EQUITY EXPERTS, and the registered agent for many of Gar Liebler controlled companies and their affiliates; (c) EE Holdings, L.L.C., which is the parent company of EQUITY EXPERTS and is owned by Hael, L.L.C., Carnie Liebler and Anna Novak; (d) Hael, L.L.C.; (e) Carnie Liebler, the wife of Gar Liebler, whom testified under oath in another federal case that Gar Liebler owned EQUITY EXPERTS at one time, divested his ownership to Carnie Liebler, his wife, whom she held at one time 90% ownership of the company, her minor son at the time an ownership interest was provided to him, J.L., held at one time 3% ownership of the company and Michael Novak held at one time an ownership interest; (f) J.L.; (g) Anna Novak, the wife of Equity Expert's, President, Michel Novak; and (h) Expert Support Solutions, LLC, the entity that appears on

WALDREP's credit card statement as the company to whom his intended payment to EQUITY EXPERTS was received by, that also operates out of 2391 Pontiac Road, Auburn Hills, MI 48326.

16.    The above corporate structures and relationships enables EQUITY EXPERTS to keep accumulated net worth off its books, reduces the amount of any class liability to it under the FDCPA § 1692k(a)(2)(B) in cases seeking statutory damages, and at the same time enables the Liblers and Novaks to profit from EQUITY EXPERTS's profits.

### FACTS

17.    WALDREP incorporates paragraphs 2-7 herein.

18.    WALDREP pays his Paramount Estates of Auburn Hills ("PARAMOUNT") annual association dues. (Exhibit A) (February 2021 billing statement showed a balance owed to PARAMOUNT of $0.00 as of 1/5/2021, and a new assessment of $400 billed on 2/1/2021).

19.    On February 1, 2021, WALDREP paid his "HOA DUES, Account bal paid in full". (Exhibit B).

20.    Nevertheless, EQUITY EXPERTS, after being engaged by PARAMOUNT'S property manager, Trademark Realty & Management Service, LLC, ("TRADEMARK"), sent WALDREP a letter dated March 10, 2021, demanding a payment of "$920" (nine hundred twenty dollars) which did not

provide WALDREP any specific dollar breakdown on the amounts alleged to be owed for each possible category stated in the letter. (Exhibit C).

21.     WALDREP in a letter dated March 25, 2021, disputed the validity of the debt and requested a full break down in writing of what this debt is from. (Exhibit D).

22.     The next letter from EQUITY EXPERTS, dated April 30, 2021, indicated to WALDREP that, "$350.00 collection cost has been . . . added to your balance" putting the "current total balance [at] $1567.00". (Exhibit E).

23.     $920 plus $350 does not equal $1567, but EQUITY EXPERTS nevertheless demanded $1567 from WALDREP.

24.     EQUITY EXPERTS's letter dated April 30, 2021, stated in part, "Your case has not been referred to an attorney and legal proceedings have not been started at this time, but we intend to do so if the debt is not paid." (Id.)

25.     EQUITY EXPERTS sent WALDREP a letter dated May 12, 2021, that also included a document titled "STATEMENT OF ACCOUNT", (Exhibit F), that in part indicated that on "3/10/2021", the same date as the first letter from EQUITY EXPERTS to WALDREP,  "$270 (two hundred seventy dollar) "FDCPA COMPLIANCE ASSURANCE / DUN LETTER" fee was assessed, followed on "4/30/2021", the same date as the second letter from EQUITY EXPERTS to

WALDREP, $350 (three hundred fifty dollar) "ESCLATED DEBTOR OUTREACH 1" fee was assessed.

26.    EQUITY EXPERTS sent WALDREP a collection letter dated May 13, 2021, that did not state the amount claimed to be owed, but indicated, in part, that, "You may avoid additional collection charges if you contact us within seven (7) days and make satisfactory payment arrangements", but the letter does not state the amount that EQUITY EXPERTS seeks to collect.  (Exhibit G).

27.    EQUITY EXPERTS sent WALDREP a collection letter dated May 19, 2021, that did not state the amount claimed to be owed, but indicated, in part, that, "You may avoid additional collection charges if you contact us within seven (7) days and make satisfactory payment arrangements", but the letter does not state the amount that EQUITY EXPERTS seeks to collect.  (Exhibit H).

28.    EQUITY EXPERTS sent a letter to WALDREP, dated June 3, 2021, indicating in part that, "If you do not call and either pay the debt or agree to a payment plan within seven (7) days, we will escalate your file to our Post Outreach Lien Enforcement process.  If we escalate your file, an additional $650.00 collection fee will be . . . added to your account."  (Exhibit I).

29.    After WALDREP's and his legal counsel, Ms. Sexton, on WALDREP's behalf, attempts disputing the debt EQUITY EXPERTS was attempting to collect from WALDREP, including EQUITY EXPERTS's collection

fees, were unsuccessful, WALDREP felt he had no alternative, and under duress, to pay EQUITY EXPERTS all the moneys EQUITY EXPERTS demanded in order to buy WALDREP peace of mind, avoid more collection fees EQUITY EXPERTS indicated that it would seek form WALDREP, and to avoid any potential legal proceeding from being initiated, as promised by EQUITY EXPERTS would be forthcoming, which could cause WALDREP reputational damage.

30.    EQUITY EXPERTS is a collection agency, not a law firm, that collects condominium and homeowners' associations' debts, yet it demanded as due and owing $620 dollars as of April 30, 2021, for the end-product received by WALDREP being two demand letters, one dated March 10, 2021, and the other dated April 30, 2021, the total cost of creating each form template letter by a push of a button and sending it via the US Mail, is less than $2.00 (two dollars).

31.    EQUITY EXPERTS's business model is atypical as property management companies like TRADEMARK, whom are hired directly by the associations to manage the day-to-day operations of the association and are paid directly from the annual dues of the association's unit members sent directly to them for their management services, typically do not engage a debt collection agency like EQUITY EXPERTS to collect association debts, as the property management companies do the collections themselves, and if unsuccessful, to hire an attorney to file a lien or commence foreclosure proceedings for the association.

32.     EQUITY EXPERTS operates in states, like Michigan, that permit non-judicial foreclosures, which enables EQUITY EXPERTS to bypass state court judicial oversight to question whether its collection fees demanded to be paid by the unit owners directly are permissible under Michigan law, permitted under the association's bylaws, alternatively, are reasonable.

33.     EQUITY EXPERTS's business model is based on its partnerships with the nation's largest community association management companies.

34.     EQUITY EXPERTS, on its website, promotes the benefits to property management companies, that by engaging EQUITY EXPERTS the management company will no longer need to provide collection services to the associations and hiring EQUITY EXPERTS can bring in "additional revenue for their Management Companies" "up to $30k in addition revenue" to "over **$1 Million**" dollars:



https://equityexperts.org/integrated-partnership/ (visited Nov. 2, 2021).

35.    EQUITY EXPERTS' website, has an embedded YouTube video that, in part indicates that Equity Experts does not "Send you a monthly invoice" and:



https://equityexperts.org/ (visited Nov. 2, 2021).

36.    Once EQUITY EXPERTS is engaged to collect a debt from a unit owner, EQUITY EXPERTS's policy mandates that both the association's board and the association's property manager not to communicate with the unit owner regarding the debt:

> [a]t Equity Experts, we know that board members and managers are sometimes contacted by owners in collection.  When that happens, your conversation is governed by the Fair Debt Collection Practices Act.  Rather than wade into the fog of the FDCPA, we suggest the following:
> First provide them with contact information for Equity Experts and ***let them know that you are not authorized to discuss their account***.  * * *

*Never provide information about accounts or balances*. This is another important aspect of the FDCPA and a potential way to manipulate your good intentions. So, let us handle those details. Finally, remember that conversations can easily devolve into a he said she dispute. That is why we record every phone call and document every touch point, which can be dozens for a single account.

https://www.youtube.com/watch?v=y2Qi-2qg7pw (emphasis added).

37. Under MCL 559.157(1) of Michigan's Condominium Act and under Generally Accepted Accounting Principles ("GAAP"), all liabilities of the condominium association is required to be kept on the books of the condominium association, yet EQUITY EXPERTS, on its own created STATEMENT OF ACCOUNT keeps a separate set of "books" that lists its collection fees, fees that are not recorded on the books of the condominium association.

38. EQUITY EXPERTS's business model is that, none of its collection fees are "incurred" by the condominium associations, and as such, "[c]ommunities no longer have to budget for uncollected assessments whey they are partners with our Experts! Zero out-of pocket costs and we assume the risk of recovery" :



*Available on Facebook at*

https://www.facebook.com/equityexperts.org/posts/995562923963004?__cft__[0]=
AZVzspEkpEgOtMNml84SltLZGNoCJT541WTkeV2fBNeGkApq97qPOv9kq8v
Qk4mOWof_hvowrPWU8bjxC8qyWzbWLHN_W5YOfpc7tKUdheJVaKTCOHb
W78X4mfhMdurNTuyRw_HaDDyBShWrOoeUch1Q3hPILQ1xppKE3Nflo4qNn
g&__tn__=%2CO%2CP-R (visited Nov. 3, 2021).

39.    A Condominium Management Company, Inc. ("ACMCI"), ACMCI PARAMOUNT'S retained property manager until on or around January 2021, budgeted and reported to PARAMOUNT line item amounts outside of its included

management fees that included collection services, "FOR THE YEAR ENDED DECEMBER 31, 2017" "Legal/Collection Costs    2,209".

40.    ACMCI budgeted and reported to PARAMOUNT line item amounts outside of its included management fees that included collection services "Revenue and Expenses.    Monday January 1, 2018 to Sunday September 30, 2018" "Legal/Collection Fees.    $1,397.94".

41.    PARAMOUNT's 2022 Budget, prepared by TRADEMARK, does not have any line item for collections, it instead has a line item for "Legal" "Misc. advise" and budgeted "$ 500" for this anticipated service.

42.    Budgets prepared by a condominium association's property managers are used by a condominium association's board members to evaluate what liabilities may be incurred by the association in the upcoming fiscal year.

43.    In response to other lawsuits brought under the Fair Debt Collection Practices Act, such as *Cover-Killewald et al. v. Brookside of Superior Township Condominium Association, et al.*, 2:14-cv-12102-LJM-RSW (E.D. Mich. May 27, 2014), and *Speight et al. v. Equityexpts.org, LLC,* 2:17-cv-13663-TGB-MKM (E.D. Mich. Nov. 11, 2017), EQUITY EXPERTS has modified its contracting documents and letters to debtors.

44.     Since lawsuits such as *Cover-Killewald* and *Speight*, EQUITY EXPERTS has modified its collection related documents to create an illusory defense on paper to its challenged collection practices.

45.     Furthermore, EQUITY EXPERTS has, with frequency at the summary judgment stage, submitted to the court a declaration or affidavit of Jacqueline Galofaro, EQUITY EXPERTS's in-house counsel and Vice President, referring to the "association", the common meaning being the association's elected board, when the communications described therein are in fact between EQUITY EXPERTS and the property manager who engaged EQUITY EXPERTS.

46.     EQUITY EXPERTS's collection practices, attempting to collect a debt that arose under a Virginia condominium's bylaws, bylaws that do not track Michigan's condominium law or the form bylaws used by condominium developers in Michigan when organizing a condominium development, was examined in *Sparks v. Equityexperts,* 936 F.3d 349 (6th Cir. 2019), in which the Sixth Circuit stated:

> Our affirmance does not suggest that Equity Experts collection practices otherwise comply with the FDCPA. At least at first blush, it is troubling that a debt of $220 grew, because of Equity Experts' fees, to more than $1000 in a few months of collection efforts. The Sparkses have not, however, argued that Equity Experts' fees were unreasonably high. Nor have they provided substantial evidence of an understanding between Equity Experts and the Association that the Association would never actually have to pay the collection fees. Had they, this might be a different case.

> *Id.* at 354

47.     The Court at oral arguments in *Sparks* stated, in part, that:

I have to be candid, I hate to rule in your favor if it suggest that this Court is saying that a scheme like this, where the association never actually has to pay exorbitant costs, but allows this collection agency to threaten exorbitant costs and foreclose upon the home in order to obtain them, in order to brow beat people into paying much more limited amounts of money. There's got to be a way that can be challenged. If you are saying that's no way that can be challenged because the contract the way it is written allows that kind of procedure. That's problematic. . . . And you won't say that there is a way to challenge that, that's what troubles me.

*Sparks v. EquityExpertsorg LLC et al,* 18-2378, Court Audio, 28:27 – 29:23 (cleaned up).

48.     Despite the Sixth Circuit's *dicta* and comments during oral arguments, EQUITY EXPERTS states on its website, "Equity Experts' business model was also upheld through a ruling in the 6th Circuit Court of Appeals last year", https://equityexperts.org/legal/legal-update-collection-fees/ (visited Nov. 2, 2021), and states that "ESTABLISHING PRECEDENT – We will continue to engage in lawsuits across the country. . . ." https://equityexperts.org/advocacy/ (visited Nov. 2, 2021).

49.     On December 23, 2019, The State of Michigan, Department of Licensing and Regulatory Affairs, initiated a Formal Complaint in *In the Matter of Equityexperts.org, LLC, License No. 24-01-002092, and Jacqueline Christine Galofaro, License No. 24-02-002835,* File No. 24-19-340756 and 24-19-341955, after "receiving notice that Respondents charged excessive fees in connection with collecting a debt" and in Count I found that, "Respondents' conduct, as described

17

above, evidences the failure to preserve the books, accounts, and records, and make them or true copies of them accessible to the Department, contrary to MCL 339.910(2), in violation of MCL 339.917(f)."

50.     On June 9, 2020, Equity Experts' Vice President and General Counsel, Jacqueline Galofaro, in *In the Matter of Equityexperts.org, LLC, License No. 24-01-002092, and Jacqueline Christine Galofaro, License No. 24-02-002835,* File No. 24-19-340756 and 24-19-341955, entered on behalf of EQUITY EXPERTS and herself a Stipulation that the "facts alleged in the Complaint are true and constitute violations of MCL 339.917(f)."

51.     On January 20, 2021, Equity Experts' Vice President and General Counsel, Jacqueline Galofaro, entered on behalf EquityExperts.org Midwest, LLC, into a Consent Order with the State of Minnesota, in *In the Matter of the Debt Collection Agency License of EquityExperts.org Midwest, LLC,* OAH Docket No. 21-1005-36622, in which a determination was made, although disputed, that EquityExperts.org Midwest, LLC is "untrustworthy, incompetent or unqualified to act under the license granted by the Commissioner[.]"

### FACTS REGARDING
### PARAMOUNT, WALDREP AND
### PARAMOUNT'S PROPERTY MANAGERS

52.     WALDREP closed on his residence in PARAMOUNT on December 22, 2006.

53.     WALDREP has at times used his personal residence in PARAMOUNT to celebrate the Holidays with a "sound and light spectacular":



See Oakland County Blog, *Our Dancing Lights Glows with Holiday Tradition in Oakland County!* (Dec. 21, 2018) *available at* https://oaklandcountyblog.com/tag/christmas-lights/ (visited October 11, 2021).

54.     The Holidays display also raises money for Rainbow Connection, helping to raise money, "to help fulfill the wishes of Michigan Children with life-threatening medical conditions." Click on Detroit, Holiday display in Auburn Hills raises money for Rainbow Connection, https://www.clickondetroit.com/community/2015/12/09/holiday-display-in-auburn-hills-raises-money-for-rainbow-connection/ (Dec. 9, 2015) (visited Oct. 11, 2021).

55.     The Holidays lightshow began in 2009 and ran almost annually until a new condominium association board decided to seek legal advice to see if it had the power to cancel WALDREP's holiday light celebration.

56.     The PARAMOUNT's board's retained counsel, Makower Abbate Guerra Wegner Vollmer , sent WALDREP a cease and desist letter dated March 14, 2019, indicating that future lightshows would violate multiple provisions of the association's bylaws and demanded that "**you refrain from conducting or performing any future Holiday Light Show unless written authorization is obtained from the Board**" further informing him that, "any legal fees and costs incurred by the Association in enforcing these restrictions against you will be your responsibility pursuant to the Bylaws."

57.     On information and belief, the fees paid to Makower Abbate Guerra Wegner Vollmer for the March 14, 2019 letter to WALDREP was paid by ACMCI, whom was PARAMOUNT's property manager at the time, from the annual association dues ACMCI received from PARAMOUNT's unit owners.

58.     ACMCI provided PARAMOUNT collection services as part of the management services that it provided to PARAMOUNT.

59.     Specifically, ACMCI would, "collect the monthly maintenance fees and assessments. The money is deposited into the Association's operating fund bank

account. Delinquencies are addressed immediately after the payment due date."
https://acondomgt.com/services/ (visited Oct. 28, 2021).

60.     The collection services ACMCI provided PARAMOUNT were included in the total amount of management fees ACMCI would receive from the monies it received from PARAMOUNT's unit owners paid as association dues.

61.     At PARAMOUNT's board meeting on March 21, 2019, WALDREP was informed by PARAMOUNT's board member Gladys Green and Eric Mazure of PARAMOUNT's property manager at the time, ACMCI, that in relation to the fines and fees related to the attorney letter, those amounts would all be waived and WALDREP would have a zero balance.

62.     WALDREP has refrained from further Holiday Light Shows.

63.     On or around February 19, 2020, ACMCI sent WALDREP a letter that included an Association Dues Statement/Invoice with a total balance of $700, indicating a "Beginning Balance" of $300 noting "Unpaid Charges" of "12/31/2019 Legal Fee Reimbursement Dec 2019 Legal Services Rendered" "Charge $300" and "1/1/2020 Annual Dues" "Charge $400".

64.     WALDREP disputed the $300 charge with ACMCI on February 27, 2020, and ACMCI did not respond in substance, but stated that it will get back to WALDREP.

65.     WALDREP on April 20, 2020, followed up with his dispute with ACMCI, whom again did not respond in substance to the dispute of the Unpaid Charges" of "12/31/2019 Legal Fee Reimbursement Dec 2019 Legal Services Rendered" "Charge $300".

66.     Makower Abbate Guerra Wegner Vollmer sent WALDREP a letter dated April 30, 2020, which stated in part, "[t]he Association reached out to me regarding the legal fees that incurred in 2019 being assessed by the Association to your unit account. . . . the Association may assess the legal fees it incurs in seeking a Co-owner's compliance with the governing documents to the Co-owner in violation.  Furthermore, Article VI, Section 16 of the Bylaws also states in pertinent part that any and all actual attorney's fees incurred by the Association in enforcing any of the restrictions or rules and regulations may be assessed to and collected from the responsible Co-owner."

67.     The monies for Makower Abbate Guerra Wegner Vollmer's legal services to PARAMOUNT regarding WALDREP in December 2019, were not related to any enforcement action against WALDREP to, "enforce[] any of the restrictions or rules and regulations may be assessed to and collected from the responsible Co-owner", but related in part to a 1 foot by 4 foot sign, a sign WALDREP had permission from the association in the past to post and further believed under PARAMOUNT's Rules and Regulation, May 2011 Revised Article

VI-10 Signs-Yard Signs, he could post a sign of that size for a one-time event, "permitted without approval", and for speaking with WALDREP's counsel.

68.     On or around August 5, 2020, ACMCI sent WALDREP a letter that included an Association Dues Statement/Invoice showing that WALDREP paid his 2020 annual dues on February 25, 2020, but still included Unpaid Charges" of "12/31/2019 Legal Fee Reimbursement Dec 2019 Legal Services Rendered" an included three "Late Fee"s of $50 each.

69.     On November 12, 2020, at an association board meeting of PARAMOUNT, WALDREP was informed that he was not in good standing and unable to participate due to outstanding monies owed, at which time WALDREP requested the association board to permit him to dispute the legal fees assessed, with no response at the time from the association board.

70.     Notably, in November 2019, local news stations aired stories on PARAMOUNT, bringing PARAMOUNT negative publicity, regarding PARAMOUNT shutting down WALDREP's light display by threating to sue him and seek legal fees if he did not cease and desist the Holiday light show.   E.g. Dave Spencer, Legal threat could shut down dazzling Auburn Hills holiday light show, hurting charity, Fox 2 Detroit (Nov. 19, 2019) (*available at* *https://www.fox2detroit.com/news/legal-threat-could-shut-down-dazzling-auburn-hills-holiday-light-show-hurting-charity* ).

71.    The next PARAMOUNT association dues bill that WALDREP received had the disputed December 2019 legal fees and late fees removed.  (Exhibit A).

72.    On or around January 2021, PARAMOUNT changed property managers from ACMCI to TRADEMARK.

73.    TRADEMARK offers collection services as part of the management services it provides:



## HOA AND CONDO ASSOCIATIONS

We offer a complete range of Homeowner Association and Condominium Association Management Services. Bundle Pricing for Grounds Maintenance, Snow Removal and/or Pool Management provide significant savings for your Association.

REQUEST PROPOSAL

- Pay Assessments Online
- Owner Web Portal
- Community Website
- Board Meeting Attendance
- Site Inspections
- Proactive Maintenance
- Financial Management
- Collections
- Month End Reporting
- Vendor Management
- Plan Development
- Administrative Services
- Rule Enforcement

https://trademarkpropertysolutions.com/management.htm#hoa          (visited October 28, 2021).

74.    PARAMOUNT unit owners would then send TRADEMARK their association dues, monies from which TRADEMARK in turn pays itself for its management services.

75.     PARAMOUNT would not owe any additional monies for TRADEMARK's collection services beyond those contracted for as part of the total management fees and TRADEMARK would pay itself out of the PARAMOUNT unit owner's association dues paid to TRADEMARK.

76.     In Michigan, the condominium association – unit owner relationship is unique, not a typical creditor – debtor relationship, as the condominium association's board members are not only the fiduciaries to the condominium association itself, they are also fiduciaries to the unit owners too, and thus cannot, without breaching that fiduciary duty, permit impermissible and/or excessive collection fees to be sought from its members, as allowing such collection fees would cause further injury to a financially distressed unit member putting them in a deeper financial hole, which damages the financial health of the association as a whole.

## ADDITIONAL FACTS REGARDING
## EQUITY EXPERTS

77.     TRADEMARK is believed to have been involved in the contracting of EQUITY EXPERTS in regard to PARAMOUNT.

78.     When EQUITY EXPERTS obtains a file from one of its partner association management companies on a condominium association debt in default, EQUITY EXPERTS, prior to any communication with the debtor, will add its fees of more than two hundred dollars for a "FDCPA COMPLIANCE ASSURANCE / DUN LETTER" to the principal amount alleged to be owed.

79.    If EQUITY EXPERTS collection fees and principal demanded in EQUITY EXPERTS's initial collection letter are not paid, typically the next month EQUITY EXPERTS will add more than three hundred dollars more in collection fees, calling it "ESCLATED DEBTOR OUTREACH", to which the service provided by EQUITY EXPERTS that the debtor sees is form collection letters being sent to the debtor.

80.    If EQUITY EXPERTS collection fees and principal demanded are not paid, EQUITY EXPERTS will continue to add on other "EXTENDED OUTREACH" collection fees to the previous balance.

81.    EQUITY EXPERTS's website states, in part, that "Our fees are deferred and usually recovered from the homeowner as part of their total balance":

## DEFERRED IS PREFERRED

Keep your cash! Our fees are deferred and usually recovered from the homeowner as part of their total balance. Now THAT is a fiduciary no-brainer!

https://equityexperts.org/collections-protection/ (visited Nov. 3, 2021).

82.    EQUITY EXPERTS's website states in part, "deferred fee model" and "$0 hourly rate":

**BUDGET FRIENDLY**

Fiduciaries are protected with our deferred fee model and proven track record. With this approach, Communities gain:

- Guaranteed positive cash flow
- $0 hourly rate
- File resolutions in under 90-days

All parties are aligned on the same positive outcome of resolving the delinquency as quickly as possible at as low a cost as possible.

https://equityexperts.org/pricing/ (visited Nov. 3, 2021).

83. EQUITY EXPERTS's website, has stated in the past, in part, "**No Risk**" "Our goals are completely aligned with yours. Zero-out-of-pocket costs and we assume the risk of recovery."

84. EQUITY EXPERTS' website on at least October 23, 2017, at https://equityexperts.org/contact, stated in part, "Imagine looking over your budget and seeing zero in the line item for delinquency resolution. Equity Experts improves the health of communities by following a proven process with no out-of-pocket costs for the collection of association debts."

85. EQUITY EXPERTS' website on at least October 23, 2017, at https://equityexperts.org/contact, stated in part, "Equity Experts quickly and efficiently resolves debts through innovative collection solutions. Our proven

process leverages technology and applies best-practices to deliver predictable and measurable results at no risk to our clients."

86.     EQUITY EXPERTS' advertising material, has in part included statements, "NUMBERS DON'T LIE" "$0.00 – Costs to the Association for solving files (including lawsuit, foreclosure and credit reporting)" and the "EE GUARANTEE" is that the debtor will file Chapter 7 bankruptcy, or "ON THE OTHER 97-98% OF FILES, WE COLLECT 100% OF THE BALANCE OWED, GUARANTEED!".

87.     EQUITY EXPERTS's quoted statements in paragraphs 79-84, *supra,* are not mere puffery at the time there were made by EQUITY EXPERTS, they were true at the time EQUITY EXPERTS made them.

88.     The statement in the form March 10, 2021 letter, sent by EQUITY EXPERTS, that there are any, "amounts incurred by the Association to collect the debt", is false as PARAMOUNT has not "incurred" any amounts of liability for EQUITY EXPERTS's collection services.

89.     The statement in the form April 30, 2021 letter, sent by EQUITY EXPERTS, that "an additional $350.00 collection cost has been charged to the association to be added to your balance" is false as no amount by EQUITY EXPERTS has been "charged" to PARAMOUNT.

90.     The statement in the form May 12, 2021 letter sent by EQUITY EXPERTS, that, "Equity Experts' collection fees that have been incurred by the Association, which are the personal responsibility under the Association's covenants and bylaws" is false as PARAMOUNT has not "incurred" any amounts of liability for EQUITY EXPERTS's collection services and the "Association's covenants and bylaws" do not permit EQUITY EXPERTS to add its "collection fees" amount to any association debt alleged to be owed by unit owner.

91.     The language in the letter dated June 3, 2021, that "If we escalate your file an additional $650.00 collection fee will be charged to the association" is false as no amounts of money are "charged" to the association for EQUITY EXPERTS's collection fees.

92.     After attempts with EQUITY EXPERTS to resolve the disputed debt were unsuccessful, WALDREP felt he had no alternative than to pay EQUITY EXPERTS the moneys it demanded in order to buy WALDREP peace of mind, avoid more collection fees EQUITY EXPERTS indicated that it would seek form WALDREP, and to avoid any potential legal proceeding from being initiated which could cause WALDREP reputational damage.

93.     Michael Novak has previously testified under oath in another federal lawsuit against EQUITY EXPERTS, in part that, EQUITY EXPERTS's, "deferred

cost model gives us a competitive advantage" over EQUITY EXPERTS's competition.

94.     15 U.S.C. §1692(e) Purposes, provides in part, "It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantage[.]"

**FACTS OF PARAMOUNT'S BYLAWS AND MICHIGAN LAW**

95.     PARAMOUNT's Bylaws, in part, provide:

ARTICLE II ASSESSMENTS, **Section 6.** <u>Enforcement.</u>  E. <u>Expenses of Collection</u>.  All expenses incurred in collecting unpaid assessments, including interests, fines, costs, actual attorneys' fees (not limited to statutory fees) and advances for taxes or other liens or costs paid by the Association to protect its lien, shall be chargeable to the Co-owner in default and shall be secured by the lien on his Unit. * * *

**ARTICE XV, REMEDIES FOR DEFAULT, Section 1**. Default by a Co-owner, Any default by a Co-owner shall entitle the Association or another Co-owner or Co-owners to the following relief: * * * B. **Costs Recoverable From Co-owner**. Failure of a Co-owner and/or non-Co-owner resident or guest to comply with the Condominium Documents shall entitle the Association to recover from such Co-owner or non-Co-owner resident or guest the pre-litigation costs and actual reasonable attorneys' fees incurred in obtaining their compliance with the Condominium Documents. * * * *

(Exhibit J).

96.     Michigan law provides in part:

559.206 Default by co-owner; relief.

Sec. 106.

A default by a co-owner shall entitle the association of co-owners to the following relief:

(a) Failure to comply with any of the terms or provisions of the condominium documents, shall be grounds for relief, which may include without limitations, an action to recover sums due for damages, injunctive relief, foreclosure of lien if default in payment of assessment, or any combination thereof.

(b) In a proceeding arising because of an alleged default by a co-owner, the association of co-owners or the co-owner, if successful, shall recover the costs of the proceeding and reasonable attorney fees, as determined by the court, to the extent the condominium documents expressly so provide.

(c) Such other reasonable remedies the condominium documents may provide including but without limitation the levying of fines against co-owners after notice and hearing thereon and the imposition of late charges for nonpayment of assessments as provided in the condominium bylaws or rules and regulations of the condominium.

MCL 559.206.

## FDCPA THRESHOLD ALLEGATIONS

97.  WALDREP is a natural person.

98.  The monies sought and collected by EQUITY EXPERTS from WALDREP were claimed to be owed under PARAMOUNT's Bylaws and Covenants contained therein that governed WALDREP's personal home.

99.  The principal amount of money sought and collected by EQUITY EXPERTS from WALDREP were claimed to be in default at the time EQUITY EXPERTS's first attempted to collect from WALDREP.

100.  EQUITY EXPERTS informed WALDREP that, "This debt arose out of your membership with the Association and your ownership of the property located at 3111 Paramount Ln."

101.   EQUITY EXPERTS's statement of law and fact that, "This debt arose out of your membership with the Association and your ownership of the property located at 3111 Paramount Ln" is true.

102.   The principal amount of money EQUITY EXPERTS sought to collect from WALDREP is a "debt" as that term is used in 15 U.S.C. § 1692a(5) as it is "any obligation or ***alleged obligation*** of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes", in this case under PARAMOUNT's bylaws. 15 U.S.C. § 1692a(5) (emphasis added).

103.   EQUITY EXPERTS's collection fees EQUITY EXPERTS sought to collect from WALDREP is a "debt" as that term is used in 15 U.S.C. § 1692a(5) as it is "any obligation or ***alleged obligation*** of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes", in this case under PARAMOUNT's bylaws. 15 U.S.C. § 1692a(5) (emphasis added).

104.   WALDREP is a "consumer" as that term is used in 15 U.S.C. § 1692a(3), as he is "any natural person obligated or ***allegedly obligated*** to pay any debt." 15 U.S.C. § 1692a(3) (emphasis added).

105.   EQUITY EXPERTS is a "debt collector" as that term is used in 15 U.S.C. § 1692a(6), as it "uses any instrumentality of interstate commerce or the

mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due ***or asserted to be owed*** or due another." 15 U.S.C. § 1692a(6) (emphasis added).

106. The letters dated March 10, April 30, May 13, May 19, and June 3, 2021, sent by EQUITY EXPERTS are each a "communication" as that term is used in 15 U.S.C. § 1692a(2).

107. The May 12, 2021, letter and enclosure sent by EQUITY EXPERTS are each a "communication" as that term is used in 15 U.S.C. § 1692a(2).

108. Phone conversations between EQUITY EXPERTS and WALDREP or WALDREP's counsel, Ms. Sexton on WALDREP's behalf, are each a "communication" as that term is used in 15 U.S.C. § 1692a(2).

## COUNT I
## FDCPA § 1692f(1) VIOLATIONS

109. Paragraphs 1-108 are incorporated herein.

110. 15 U.S.C. § 1692f(1) provides:

> (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

> 15 U.S.C. § 1692f(1).

111. PARAMOUNT is governed by Master Deed, the Bylaws, which is the "agreement creating the debt" between PARAMOUNT and WALDREP.

112.   Under the "agreement creating the debt", "All expenses incurred in collecting unpaid assessments, including interests, fines, costs, actual attorneys' fees (not limited to statutory fees) and advances for taxes or other liens or costs paid by the Association to protect its lien, shall be chargeable to the Co-owner in default and shall be secured by the lien on his Unit".

113.   PARAMOUNT did not incur "actual attorneys' fees" for EQUITY EXPERTS's collection services regarding WALDREP.

114.   PARAMOUNT did not incur any costs for EQUITY EXPERTS's collection services regarding WALDREP.

115.   EQUITY EXPERTS provides a collection service, and a service by definition involves a "fee" being charged, not a "cost".   *Compare* BLACKS LAW DICTIONARY, p. 614 (6th ed. 1990) (A "fee" is "[a] charge fixed by law for services . . [a] recompence for an official or professional services or a charge or emolument or compensation for a particular act or service.") *with* BLACKS LAW DICTIONARY, p. 345 (6th ed. 1990) (a "cost" is an "[e]xpense; price.   The sum or equivalent expended, paid or charged for something.   *See also* Actual cost; Costs; Net Costs; Rate.")

116.   EQUITY EXPERTS's itself informed WALDREP that amounts of monies added to the debt's principal were a collection "fee".

117. Under Michigan law, the payment of a debtor's bills by a third-party, relieves the debtor, "of any responsibility or legal obligation to pay the [creditor] further amounts" if the payment is accepted by the creditor. *Bombalski v Auto Club Ins. Assoc.*, 247 Mich. App. 536, 543; 637 N.W.2d 251 (Mich. App. 2001).

118. PARAMOUNT is governed by the Michigan Condominium Act, MCL § 559.101-559.276.

119. Michigan condominium associations are required to keep under MCL 559.157(1) its books and those books that are to be maintained under GAAP.

120. Under GAAP, the definition of cost and revenue is goods changing hands.

121. GAAP would be an accrual method for a condominium association.

122. GAAP requires all incurred cost to be put on the condominium association books.

123. Similarly, costs are placed on the condominium association books that were not incurred costs, that would violate GAAP.

124. EQUITY EXPERTS keeps its collection fees that it attempts to collect from a condominium association's unit owner off of the Michigan condominium association's books, by EQUITY EXPERTS itself creating a "STATEMENT OF ACCOUNT" that it maintains.

125.   When WALDREP paid EQUITY EXPERTS monies, that included the charge of $270 for the collection service described by EQUITY EXPERTS as "FDCPA COMPLIANCE ASSURANCE / DUN LETTER" PARAMOUNT did not have a recorded expense.

126.   When WALDREP paid EQUITY EXPERTS monies, that included the charge of $270 for the collection service described by EQUITY EXPERTS as "FDCPA COMPLIANCE ASSURANCE / DUN LETTER" PARAMOUNT was not indebted to EQUITY EXPERTS.

127.   When WALDREP paid EQUITY EXPERTS monies, that included the charge of $350 for the collection service described by EQUITY EXPERTS as "ESCALATED DEBTOR OUTREACH" fee, PARAMOUNT did not have a recorded expense.

128.   When WALDREP paid EQUITY EXPERTS monies, that included the charge of $350 for the collection service described by EQUITY EXPERTS as "ESCALATED DEBTOR OUTREACH" fee, PARAMOUNT was not indebted to EQUITY EXPERTS.

129.   When WALDREP paid EQUITY EXPERTS other monies related to its collection services, $360.14, PARAMOUNT did not have a recorded expense for that amount.

130. When WALDREP paid EQUITY EXPERTS other monies that it relates to its collection services, $360.14, PARAMOUNT was not indebted to EQUITY EXPERTS.

131. EQUITY EXPERTS collection of monies related to "our Post Outreach Lien Enforcement" of "an additional $650 collection fee", as set forth in its June 3, 2021 letter, even though no lien was placed on WALDREP's residence related to EQUITY EXPERTS's collection activities.

132. PARAMOUNT's bylaws remedy section provides in part that if a default occurs that, "shall entitle the Association to recover from such Co-owner or non-Co-owner resident or guest the pre-litigation costs and actual reasonable attorneys' fees incurred in obtaining their compliance with the Condominium Documents".

133. PARAMOUNT's association board itself had not authorized any litigation to be commenced against WALDREP.

134. "Pre-litigation costs" by its very definition contemplates the involvement of an attorney and at no time did PARAMOUNT's board of directors in regard to EQUITY EXPERTS's collection of the debt from WALDREP, hire an attorney in such a capacity.

135.   There is no authority in the Condominium Act for an association permitting a third party, like EQUITY EXPERTS, to utilize the association's special lien powers and priority status to secure payment of the third parties' collection fees.

136.   EQUITY EXPERTS violated 15 U.S.C. § 1692f.

137.   WALDREP suffered actual damages.

## CLASS ALLEGATIONS

138.   Jacqueline Galofaro, EQUITY EXPERTS's general counsel and Vice President, in prior federal litigation against EQUITY EXPERTS, in response to the question, "[s]o does Equity Experts not read the governing documents of the condominium association", was that, "it is a policy and procedure of Equity Experts to review the governing documents, yes."

139.   Michigan condominium associations bylaws are similar in that they track the Michigan Condominium Act that in regard to the collecting monies on behalf of the association additional monies are only permitted for "actual" attorney's fees incurred and costs incurred.

140.   For example, current or former associations that EQUITY EXPERTS attempted to collect monies from their unit owners, those associations' bylaws in pertinent part provides:

A. Charter Oaks Village Association' bylaws provide in part, ARTICLE II, ASSESSMENTS, Section 5, Enforcement, "The

expenses incurred in collecting unpaid assessments, including interest, costs, actual attorney's fees (not limited to statutory fees), late charges, unpaid monetary fines and advances for taxes or other liens paid by the Association to protect its lien, shall be chargeable to the Co-owner in default including late charges and unpaid monetary fines, if any, and shall be secured by the lien on the Co-owner's Unit."

B. The Brookside of Superior Township, Master Deed, Exhibit A, Condominium Bylaws, Article II Assessments, Section 5(d) <u>Expenses of Collection</u>: The expenses incurred in collecting unpaid assessments, including interest, costs, actual attorney's fees (not limited to statutory fees) and advances for taxes or other liens paid by the Association to protect its lien, shall be chargeable to the Co-owner in default and shall be secured by the lien on his Unit.

C. Master Deed for Country Pound Estates, Exhibit "A" Condominium Bylaws, Article II, Assessments, Section 2.7 <u>*Enforcement*,</u> filed with the Wayne County Register of Deeds on or around May 20, 1999, in pertinent part provides: *(d) <u>Expenses of Collection</u>*. The expenses incurred by the Associate in

collecting unpaid assessments, including interest, costs, actual attorneys' fees (not limited to statutory fees) advances for taxes or other liens paid by the Association to protect its lien, shall be chargeable to the defaulting Co-owner and shall be secured by a lien on his Unit.

141. For Count I, WALDREP proposes three classes:

A. The FDCPA COMPLIANCE ASSURANCE / DUN LETTER class is defined as: (1) All persons whom EQUITY EXPERTS sent a letter to that included an amount for a "FDCPA COMPLIANCE ASSURANCE / DUN LETTER", or similar fee associated with a new collection account placed with EQUITY EXPERTS and sending an initial collection letter; (2) where the letter related to a condominium located in Michigan; (3) where the letter was sent one year prior to the filing of this Complaint, and (4) where the person paid monies related to EQUITY EXPERTS's collection fee assessed for a "FDCPA COMPLIANCE ASSURANCE / DUN LETTER", or similar fee associated with a new collection account placed with EQUITY EXPERTS and sending an initial collection letter;

B. The ESCALATED DEBTOR OUTREACH class is defined as: (1) All persons whom EQUITY EXPERTS sent a letter to that included an amount for a "ESCALATED DEBTOR OUTREACH" fee, or similar fee associated with form letters sent by EQUITY EXPERTS after the initial collection letter; (2) where the letter related to a condominium located in Michigan; (3) where the letter was sent one year prior to the filing of this Complaint, and (4) where the person paid monies related to EQUITY EXPERTS's collection fee assessed for a "ESCALATED DEBTOR OUTREACH" fee, or similar fee associated with form letters sent by EQUITY EXPERTS after the initial collection letter;

C. The Post Outreach Lien Enforcement process class is defined as: (1) All persons whom EQUITY EXPERTS sent a letter to that indicated that "additional collection charges" for a "Post Outreach Lien Enforcement process" would be assessed; (2) where the letter related to a condominium located in Michigan; (3) where the letter was sent one year prior to the filing of this Complaint, and (4) where the person paid monies related to

EQUITY EXPERTS's collection fee assessed for a "Post Outreach Lien Enforcement process".

142. Excluded from the class definition above are persons whom: (1) have filed a lawsuit against EQUITY EXPERTS; or (2) have entered into a written settlement agreement that would release any and all claims against EQUITY EXPERTS.

143. On information and belief there are more than 40 persons defined in each of the proposed three classes above for Count I.

144. There are questions of law and fact common to each class that predominate over any questions affecting only individual class members.

145. The predominate questions are whether the "FDCPA COMPLIANCE ASSURANCE / DUN LETTER" fee, "ESCALATED DEBTOR OUTREACH" fee and "Post Outreach Lien Enforcement process" fee were each "incurred" "actual attorney's fees" or each "incurred" "costs" by the class members' respective condominium association.

146. WALDREP will fairly and adequately protect the interests of the class he seeks to have certified as he seeks the same relief actual and statutory damages under the FDCPA, and his claims are common and typical to the class defined herein.

147. WALDREP has retained Curtis C. Warner, who is counsel experienced in handling class actions brought under the FDCPA and other consumer statutes,

obtaining settlements deemed by courts to be fair, reasonable and adequate. *Schafer v. Allied Interstate LLC, et. al.,* 17-cv-233 (W.D. Mich. July 1, 2021) (FDCPA); *Soto et. al. v. Great America LLC,* 17 CH 1118 (19th Judicial Circuit Court, Lake County, Illinois, June 18, 2021) (FCRA – Receipt); *Sowles v. Weltman, Weinberg & Reis Co., LPA,* 19-cv-10254 (E.D. Mich. Oct. 23, 2020) (FDCPA); *Pilaraski v. Rent Recover of Better NOI LLC,* 17-cv-8659 (N.D. Ill. Sept. 25, 2019) (FDCPA); *Loveday v. Financial Asset Management Systems, Inc.,* 18-cv-10218 (E.D. Mich. May 24, 2019) (FDCPA); *Dilallo et al. v. Miller and Steeno, P.C., et al.,* 16 C 51 (N.D. Ill. Mar. 16, 2018) (FDCPA); *Patel v. AT&T Services, Inc.,* 15 C 8174 (N.D. Ill. Sept. 20, 2017) (TCPA – Autodialer); *Florence Mussat, M.D., S.C. v. E.S. Medical Supplies and Equipment Inc.,* 16 C 1240 (N.D. Ill. Sept. 13, 2017) (TCPA – Junk Fax); *Tsang v. Zara USA, Inc.,* 15-cv-11160 (N.D. Ill. Nov. 2, 2016) (FCRA – Receipt); *Vasquez v. Zara USA, Inc.,* 15 C 3433 (N.D. Ill. March 8, 2016) (FCRA – Receipt); *Florence Mussat, M.D., S.C. v. Insurance Group of America Holdings, LLC.,* 13 C 7798 (N.D. Ill. May 7, 2015) (TCPA – Junk Fax); *Krishnan et al. v. Autovest LLC,* 13 C 8654 (N.D. Ill. Mar. 27, 2015) (FDCPA); *Paci v. Elmhurst Auto Werks, LTD,* 14 C 1158 (N.D. Ill. Feb. 2, 2015) (FCRA – Receipt); *Pursak v. Lumber Liquidators, Inc.,* 12 C 6984 (N.D. Ill Nov. 17, 2014) (FCRA – Receipt); *Florence Mussat M.D., S.C. v. Betterdoctor, Inc.,* 13 C 8377 (N.D. Ill. July 10, 2014) (TCPA Junk Fax); *Sanders et. al. v. W&W Wholesale, Inc.,* 11 C 3557 (N.D. Ill.

Apr. 11, 2014) (FCRA – Receipt); *Bargains in a Box, Inc.*, 13 C 3964 (N.D. Ill. Mar. 27, 2014) (FCRA – Receipt); *Florence Mussat M.D., S.C. v. Global Healthcare Resource, LLC,* 11 C 7035 (N.D. Ill. Nov. 1, 2013) (TCPA Junk Fax); *Tang v. Medical Recovery Specialists Inc.*, 11 C 2109 (N.D. Ill) (FDCPA); *Tang v. Pita Inn Inc*, 11 C 3833 (N.D. Ill. May 2, 2012) (FCRA – Receipt); *Balbarin v. North Star Acquisition,* LLC, 10 C 1846 (N.D. Ill. Apr. 12, 2012) (TCPA Autodialer); *O'Hara v. Medieval Times USA, Inc.*, 3:10-cv-751 (D. N.J. Mar. 6, 2012) (FCRA – Receipt); *Todd v. HB Windows and Doors*, *Inc.*, 10 C 4986 (N.D. Ill. Aug. 18, 2011) (FCRA – Receipt); *Seppanen v. Krist Oil Co.*, 2:09-cv-195 (W.D. Mich. Aug. 9, 2011) (FCRA – Receipt); *Vallejo v. National Credit Adjusters,* LLC, 10-cv-103 (N.D. Ind. Nov. 3, 2010) (FDCPA); *Mitchem v. Northstar Location Services,* LLC, 09 C 6711, (N.D. Ill. May 13, 2010) (FDCPA); *Housenkamp v. Weltman, Weinberg & Reis, Co. of Michigan*, Case No. 1:09-cv-10613-TLL-CEB (E.D. Mich. May 11, 2010) (FDCPA); *Kern v. LVNV Funding, Inc.*, 09 C 2202, (N.D. Ill. Jan. 21, 2010) (FDCPA); *Prieto et al. v. HBLC, Inc. and Steven J. Fink & Assoc., P.C.*, 08 C 2817 (N.D. Ill. Dec. 15, 2008) (FDCPA); *Dobson v. Asset Acceptance LLC*, 07 C 6203, (assigned as related to 07 C 5967) (N.D. Ill. 2008) (FDCPA); *Horton v. IQ Telecom*, 07 C 2478 (N.D. Ill. May 5, 2008) (FDCPA).

148. Whether a condominium association "incurs" the collection fees EQUITY EXPERTS collected from WALDREP and the class members, predominates over any other issues.

149. A class action is an appropriate method for the fair and efficient adjudication of this controversy as predominately most class members do not know that their rights are being violated by EQUITY EXPERTS, and with cases brought as individual matters EQUITY EXPERTS will vigorously litigate those case, sometime for years.

**WHEREFORE,** WALDREP requests this Honorable court to enter judgment against EQUITY EXPERTS on Count I as follows:

A. An award of actual damages under 15 U.S.C. § 1692k(a)(1) and 15 U.S.C. § 1692k(a)(2)(B);

B. An award of statutory damages under 15 U.S.C. § 1692k(a)(2)(A) and 15 U.S.C. § 1692k(a)(2)(B);

C. Reasonable attorney's fees and costs under 15 U.S.C. § 1692k(a)(3);

D. To certify the three proposed classes in Count I;

E. Appoint WALDREP as the class representative;

F. Appoint Mr. Warner as counsel for the three proposed classes in Count I;

G. And award WALDREP a reasonable incentive award for serving

as the class representative.

## COUNT II –
## FDCPA § 1692f VIOLATIONS

150.   Paragraphs 1 – 108 are incorporated herein.

151.   Count II is brought in the alternative to Count I.

152.   15 U.S.C. § 1692f provides:

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section[.]

153.   "Historically, pursuing collections usually includes sending the homeowner a single letter to the address provided by the association, and then initiating legal action right away."  (Exhibit K) (Gar Liebler, Why Race Matters – Collections in 2020 (Aug. 13, 2020), published in various online forums e.g. https://newenglandcondo.com/article/collections-in-2020/full (visited Nov. 3, 2021).

154.   An expert witness in *Speight el. al. v. Equityexperts.org, LLC*, indicated in his report that typically, after the property manager's demand on behalf of the association is ignored, the debt will be forwarded to an attorney, and if the attorney's demand is not met, a lien will be placed upon the property and a foreclosure will soon follow.

155.   A typical chain of events will be, "[the unit owner] stopped paying condominium association dues to [] ('the Association'), giving rise to a lien being recorded on the property, foreclosure of the lien, and eventually a sheriff's sale." *Fannie Mae v. Hsiung*, 2015 Mich. App. LEXIS 2186, at *1 (Mich. Ct App, Nov. 19, 2015) (unpublished); *see also e.g. Detroit Club Holdings, LLC v Edward,* 2019 Mich. App. LEXIS 4765, at *2 (Ct App, Aug. 13, 2019) ("In October of 2014, the condominium association sent a notice to [the unit owner] at his Ann Arbor address of a lien for unpaid condominium assessments. The association also recorded a notice of the lien * * * the Association posted a Notice of a Foreclosure Sale on the condominium and published the notice in the Detroit Legal News.")

156.   Property managers typically are compensated for collection services as part of their management fees (which are taken out of the association dues sent directly to them from the unit owners) or will separately negotiate with the association to be able to charge the association ten dollars ($10.00) to twenty-five dollars ($25.00) for such a delinquency letter.

157.   It would be an unreasonable fee for EQUITY EXPERTS to assess a fee for its collection services greater than what the association's property manager charges the association.

158.   The actual cost of each of the letters sent by EQUITY EXPERTS to WALDREP is less than two dollars ($2.00).

159.   EQUITY EXPERTS added a $270 collection fee on the date the first letter was sent to WALDREP.

160.   The letters in the form of those dated March 10, 2021, are used by EQUITY EXPERTS as a basis to justify its collection fee of $270.

161.   A property manager would not charge a condominium association a "FDCPA COMPLIANCE ASSURANCE / DUN LETTER" fee as a property managers' attempt to collect a debt on behalf of the association that hired it is not subject to the Fair Debt Collection Practices Act.  15 U.S.C. § 1692a(6)(F)(i); *See Harris v. Liberty Community Management, Inc.*, 702 F.3d 1298, 1302 (11th Cir. 2012); *Johnson v. Young*, No. 2:06-cv-818, 2007 U.S. Dist. LEXIS 54766, 2007 WL 2177956 at *3 (S.D. Ohio July 27, 2007) (citing § 1692a(6)(F)); *Reynolds v. Gables Residential Services, Inc.*, 428 F. Supp. 2d 1260, 1264 (M.D. Fla. 2006); *Berndt v. Fairfield Resorts, Inc.*, 339 F.Supp.2d 1064, 1068 (W.D. Wis. 2004).

162.   Some condominium associations are self-governed and will write a demand letter themselves and if no response is received from the unit owner will engage an attorney.

163.   A collection fee of $270 asserted by EQUITY EXPERTS for the sending of an initial collection letter in the form of the March 10, 2021 letter is not reasonable as TRADEMARK could of sent a similar letter providing information to

WALDREP regarding any amount that PARAMOUNT believed was owed under PARAMOUNT's bylaws.

164.   A collection fee of $270 asserted by EQUITY EXPERTS for a service "FDCPA COMPLIANCE ASSURANCE / DUN LETTER" is not reasonable as TRADEMARK would have the name and address of the unit owner, likely know if there had been any sale or transfer of ownership of the unit, and know if the unit owner had filed bankruptcy as notice of bankruptcy are provided to the property managers even though such notice is not necessary as condominium association dues can be attached to the real property in the form of a lien.

165.   EQUITY EXPERTS added a $350 collection fee on the date the second letter was sent to WALDREP.

166.   A collection fee of $350 asserted by EQUITY EXPERTS for the sending of an initial collection letter in the form of the April 30, 2021 letter is not reasonable as TRADEMARK could of sent a similar letter providing information to WALDREP regarding any amount that PARAMOUNT believed was owed under PARAMOUNT's bylaws.

167.   The letters in the form of those dated April 30, May 13, May 19, and June 3, 2021 were unnecessary under the traditional methods of collecting alleged condominium association dues, late fees and fines assessed under the association's bylaws.

168.   The May 13 and 19, 2021, letters serve no functional collection purpose as they do not inform the recipient how much the alleged debt is.

169.   The letters in the form of those dated April 30, May 13, May 19, and June 3, 2021 are used by EQUITY EXPERTS as a basis to justify its added collection fees of $350.

170.   EQUITY EXPERTS demanded other monies related to "our Post Outreach Lien Enforcement" of "an additional $650 collection fee", as set forth in its June 3, 2021 letter, was not reasonable as no lien was placed on WALDREP's residence by EQUITY EXPERTS.

171.   Post Outreach Lien Enforcement serves no purpose as under traditional collection methods the condominium association will hire an attorney to commence a foreclosure proceeding against the unit owner after a lien has been recorded.

172.   A Post Outreach Lien Enforcement fee is not reasonable.

173.   It would be an unreasonable fee to charge an amount that would further inflict a significant financial injury on a presumably already financially distressed unit member who failed to pay monies to the association.

174.   EQUITY EXPERTS, a non-attorney, assessing collection fees in the amount of one thousand two hundred seventy dollars ($1,270) over a ninety (90) day time-period, whose collection actions seen by the debtor is form collection letters, is not reasonable.

175.  No reasonable condominium association board would allow the association to "incur" one thousand two hundred seventy dollars ($1,270) in collection fees over a ninety (90) day time-period, for a non-attorney to chase, for example a $300 disputed legal fee as is the case here.

176.  EQUITY EXPERTS violated 15 U.S.C. § 1692f.

177.  WALDREP suffered actual damages.


**CLASS ALLEGATIONS**

178.  The proposed three class for Count II is defined as:

A. The FDCPA COMPLIANCE ASSURANCE / DUN LETTER class is defined as: (1) All persons whom EQUITY EXPERTS sent a letter to that included an amount for a "FDCPA COMPLIANCE ASSURANCE / DUN LETTER", or similar fee associated with a new collection account placed with EQUITY EXPERTS and sending an initial collection letter; (2) where the letter related to a condominium located in Michigan; (3) where the letter was sent one year prior to the filing of this Complaint, and (4) where the person paid monies related to EQUITY EXPERTS's collection fee assessed for a "FDCPA COMPLIANCE ASSURANCE / DUN LETTER", or similar fee

associated with a new collection account placed with EQUITY EXPERTS and sending an initial collection letter;

B.   The ESCALATED DEBTOR OUTREACH class is defined as: (1) All persons whom EQUITY EXPERTS sent a letter to that included an amount for a "ESCALATED DEBTOR OUTREACH" fee, or similar fee associated with form letters sent by EQUITY EXPERTS after the initial collection letter; (2) where the letter related to a condominium located in Michigan; (3) where the letter was sent one year prior to the filing of this Complaint, and (4) where the person paid monies related to EQUITY EXPERTS's collection fee assessed for a "ESCALATED DEBTOR OUTREACH" fee, or similar fee associated with form letters sent by EQUITY EXPERTS after the initial collection letter;

C.  The Post Outreach Lien Enforcement process class is defined as: (1) All persons whom EQUITY EXPERTS sent a letter to that indicated that "additional collection charges" for a "Post Outreach Lien Enforcement process" would be assessed; (2) where the letter related to a condominium located in Michigan; (3) where the letter was sent one year prior to the filing of this

Complaint, and (4) where the person paid monies related to EQUITY EXPERTS's collection fee assessed for a "Post Outreach Lien Enforcement process".

179.   Excluded from the class definitions above are persons whom: (1) have filed a lawsuit against EQUITY EXPERTS; or (2) have entered into a written settlement agreement that would release any and all claims against EQUITY EXPERTS.

180.   On information and belief there are more than 40 persons defined in proposed three class in Count II above.

181.   WALDREP will fairly and adequately protect the interests of the class he seeks to have certified as he seeks the same relief actual and statutory damages under the FDCPA, and his claims are common and typical to the class defined herein.

182.   WALDREP has retained Curtis C. Warner, who is counsel experienced in handling class actions brought under the FDCPA and other consumer statutes, obtaining settlements deemed by courts to be fair, reasonable and adequate.

183.   There are questions of law and fact common to each class that predominate over any questions affecting only individual class members.

184.   The predominate questions are whether the "FDCPA COMPLIANCE ASSURANCE / DUN LETTER" fee, "ESCALATED DEBTOR OUTREACH" fee and "Post Outreach Lien Enforcement process" fee are unreasonable.

**WHEREFORE,** WALDREP requests this Honorable court to enter judgment against EQUITY EXPERTS on Count II as follows:

A. An award of actual damages under 15 U.S.C. § 1692k(a)(1) and 15 U.S.C. § 1692k(a)(2)(B);

B. An award of statutory damages under 15 U.S.C. § 1692k(a)(2)(A) and 15 U.S.C. § 1692k(a)(2)(B);

C. Reasonable attorney's fees and costs under 15 U.S.C. § 1692k(a)(3);

D. To certify the three proposed classes in Count II;

E. Appoint WALDREP as the class representative;

F. Appoint Mr. Warner as counsel for the three proposed classes in Count II;

G. And award WALDREP a reasonable incentive award for serving as the class representative.

### COUNT III
### FDCPA § 1692g(b) VIOLATIONS

185. Paragraphs 1-108 are incorporated herein

186. 15 U.S.C. § 1692g(b) that states in part:

> If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains

verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.

187. EQUITY EXPERTS sending the letter dated April 30, 2021, to WALDREP violated 15 U.S.C. § 1692g(b) as it was sent to WALDREP prior to the letter dated May 12, 2021, sent by EQUIUTY EXPERTS in response to WALDREP's dispute letter dated March 25, 2021.

188. A "baseline" for verification under 15 U.S.C. § 1692g(b) "is to enable the consumer to 'sufficiently dispute the payment obligation.'" *Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 785 (6th Cir. 2014).

189. The verification provision [15 U.S.C. § 1692g(b)] must be interpreted to provide the consumer with notice of how and when the debt was originally incurred or other sufficient notice from which the consumer could sufficiently dispute the payment obligation. This information does not have to be extensive. It should provide the date and nature of the transaction that led to the debt, such as a purchase on a particular date, a missed rental payment for a specific month, a fee for a particular service provided at a specified time, or a fine for a particular offense assessed on a certain date." *Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 785-86 (6th Cir. 2014).

190. EQUITY EXPERTS's document "STATEMENT OF ACCOUNT", fails to meet the verification requirements of 15 U.S.C. § 1692g(b) wherein it states, "Starting balance . . . . . . $: 650.00. Principal open balance".

191. EQUITY EXPERTS's document "STATEMENT OF ACCOUNT", fails to meet the verification requirements of 15 U.S.C. § 1692g(b) wherein it states, "270.00" "FDCPA COMPLIANCE ASSURANCE / DUN LETTER".

192. EQUITY EXPERTS's document "STATEMENT OF ACCOUNT", fails to meet the verification requirements of 15 U.S.C. § 1692g(b) wherein it states, "350.00" "ESCALATED DEBTOR OUTREACH"".

193. Being provided information under 15 U.S.C. § 1692g(b) assists the debtor in making an informed decision whether each line item amount sought by the debt collector is indeed a debt owed or whether they should continue to dispute the amount with EQUITY EXPERTS, seek legal advice, or file a complaint with the BBB, FTC and/or the State of Michigan, Department of Licensing and Regulatory Affairs.

194. Being provided information under 15 U.S.C. § 1692g(b) assists the debtor in making an informed decision whether each line item amount sought by the debt collector is the correct amount the debtor may owe to the creditor.

195. Being provided information under 15 U.S.C. § 1692g(b) assists the debtor in making an informed decision whether each line item amount sought by the debt collector is reasonable or unreasonable.

196. Plaintiff has suffered an informational injury.

## CLASS ALLEGATIONS

197. Count III has two proposed classes:

A. The Failure to Cease Collections Class is defined as: (1) all persons, (2) from whom EQUITY EXPERTS received a dispute of a debt or request for validation of a debt, (3) thirty days from EQUITY EXPERTS's first letter sent to the person; and (4) EQUITY EXPERTS attempted to collect a debt from on a date prior to providing any verification of the debt.

B. The Failure to Properly Verify the Debt under 15 U.S.C. § 1692g(b) Class is defined as: (1) all persons, (2) from whom EQUITY EXPERTS received a dispute of a debt or request for validation of a debt, (3) thirty days from EQUITY EXPERTS's first letter sent to the person; and (4) EQUITY EXPERTS sent the persons a "STATEMENT OF ACCOUNT", that contained at least one of the following phases: "Starting balance", "FDCPA COMPLIANCE ASSURANCE / DUN LETTER",

"ESCALATED DEBTOR OUTREACH", or "PRINC ADJ – MATCH LEDGER".

198.   Excluded from the class definitions above are persons whom: (1) have filed a lawsuit against EQUITY EXPERTS; or (2) have entered into a written settlement agreement that would release any and all claims against EQUITY EXPERTS.

199.   On information and belief, given EQUITY EXPERTS's volume collection practice, the blatant disregard of WALDREP's collection letter, and EQUITY EXPERTS's representation that it has a "98% SUCCESS RATE" and a "90 DAY AVERAGE RESOLUTION", https://equityexperts.org/ (visited Nov. 2, 2021), that there are more than 40 persons defined in the proposed Failure to Cease Collections Class above.

200.   EQUITY EXPERTS when attempting to collect monies from a unit owner, when asked for or to validate the debt will present to the unit owner EQUITY EXPERTS's prepared "STATEMENT OF ACCOUNT" under EQUITY EXPERTS's policy, practice and procedure.

201.   On information and belief there are more than 40 persons defined in the proposed Failure to Properly Verify the Debt under 15 U.S.C. § 1692g(b) Class above.

202. There are questions of law and fact common to each class that predominate over any questions affecting only individual class members.

203. WALDREP will fairly and adequately protect the interests of the class he seeks to have certified as he seeks the same relief of statutory damages under the FDCPA, and his claims are common and typical to the class defined herein.

204. WALDREP has retained Curtis C. Warner, who is counsel experienced in handling class actions brought under the FDCPA and other consumer statutes, obtaining settlements deemed by courts to be fair, reasonable and adequate.

205. The predominate question for the Failure to Cease Collections Class is whether attempting to collect a debt after receipt of a dispute letter from the debtor prior to verifying the debt is a violation of 15 U.S.C. § 1692g(b).

206. The predominate question for the Failure to Properly Verify the Debt under 15 U.S.C. § 1692g(b) Class is whether the phrases in a "STATEMENT OF ACCOUNT" created by the debt collector that contains one of the following the phrases, "Starting balance", "FDCPA COMPLIANCE ASSURANCE / DUN LETTER", "ESCALATED DEBTOR OUTREACH" or "PRINC ADJ – MATCH LEDGER", fails to comply with 15 U.S.C. § 1692g(b).

**WHEREFORE,** WALDREP requests this Honorable court to enter judgment against EQUITY EXPERTS on Count III as follows:

A. An award of statutory damages under 15 U.S.C. § 1692k(a)(2)(A) and 15 U.S.C. § 1692k(a)(2)(B);

B. Reasonable attorney's fees and costs under 15 U.S.C. § 1692k(a)(3);

C. To certify these two classes in Count III;

D. Appoint WALDREP as the class representative;

E. Appoint Mr. Warner as counsel for the classes in Count III;

F. And award WALDREP a reasonable incentive award for serving as the class representative.

## COUNT IV
## FDCPA § 1692f, f(1) VIOLATIONS
## INDIVIDUAL CLAIMS

207. Paragraphs 1-108 are incorporated herein

208. WALDREP pays his Paramount Estates of Auburn Hills ("PARAMOUNT") annual association dues. (Exhibit A) (February 2021 billing statement showed a balance owed to PARAMOUNT of $0.00 as of 1/5/2021, and a new assessment of $400 billed on 2/1/2021

209. On February 1, 2021, WALDREP paid his "HOA DUES, Account bal paid in full". (Exhibit B).

210. There was no legal of factual basis for EQUITY EXPERTS to attempt to collect a "03/02/2021" "Starting balance" amount of $650.

211.  There was no legal of factual basis for EQUITY EXPERTS to attempt to collect a "04/29/2021" "PRINC ADJ – MATCH LEDGER" amount of $297.00.

212.  EQUITY EXPERTS's attempted collection of these two amounts violated FDCPA § 1692f.

213.  EQUITY EXPERTS's collection of these two amounts violated FDCPA § 1692f(1).

214.  Plaintiff has suffered actual damages.

WHEREFORE, WALDREP requests this Honorable Court to enter judgment in his favor and against EQUITY EXPERTS for:

      A. An award of actual damages under 15 U.S.C. § 1692k(a)(1);

      B. An award of statutory damages under 15 U.S.C. § 1692k(a)(2)(A); and

      C. Reasonable attorney's fees and costs under 15 U.S.C. § 1692k(a)(3).

## COUNT V
## FRAUD

215.  Paragraphs 1 - 108 are incorporated herein.

216.  In Michigan, the elements for fraud are: (1) that the charged party made a material representation; (2) that it was false; (3) that when he or she made it he or she knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he or she made it with the intention that it should be

acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that the other party thereby suffered injury. *City of Novi v Robert Adell Children's Funded Trust*, 473 Mich. 242, 254 n. 8; 701 N.W.2d 144 (Mich. 2005).

217. EQUITY EXPERTS made material representations to WALDREP through letters and the STATEMENT OF ACCOUNT that included amounts of EQUITY EXPERTS' collection fees that were not permitted under PARAMOUNT's bylaws; (2) EQUITY EXPERTS' statements to WALDREP were false; (3) EQUITY EXPERTS' knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) EQUITY EXPERTS' has made these material representations to WALDREP with the intention that it should be acted upon by WALDREP; (5) WALDREP paid monies to Equity Experts acted in reliance upon it; and (6) WALDREP when he paid monies to EQUITY EXPERTS thereby suffered an injury.

218. The wrong that WALDREP complains about occurred when his payment of EQUITY EXPERTS' collection fees was received.

219. "Potential Fraud Schemes" regarding an account payable red flagged the following situations: "Contingent liability is understated or not recorded" and "Kickbacks are paid to vender to the CIRA's personnel or its community association management company." (Exhibit L) (Gayle L. Cagianut, Knowledge-Based Audits

™, Preparations, Compilations, and Reviews of Common Interest Realty Associations, p. 459 (2019)).

220. Michigan condominium associations are required to keep under MCL 559.157(1) its books and those books that are to be maintained under GAAP.

221. Under GAAP, the definition of cost and revenue is goods changing hands.

222. GAAP would be an accrual method for a condominium association.

223. GAAP requires all incurred cost to be put on the condominium association books.

224. Similarly, costs are placed on the condominium association books that were not incurred costs, that would violate GAAP.

225. PARAMOUNT's books do not record any liability that PARAMOUNT has to EQUITY EXPERTS' in regard to EQUITY EXPERTS' collection services regarding WALDREP.

226. EQUITY EXPERTS keeps its collection fees that it attempts to collect from a condominium association's unit owner off of the Michigan condominium association's books, by EQUITY EXPERTS itself creating a "STATEMENT OF ACCOUNT" that it maintains.

227. EQUITY EXPERTS facilitates a "kickback" type scheme in which property managers, like TRADEMARK whose management fees include collection

services for the association, now does not have to perform those collection services, but nevertheless receives monies from EQUITY EXPERTS that TRADEMARK takes from for its management fees at no cost to TRADEMARK.

228.　EQUITY EXPERTS's business model thrives upon the greed and laziness of the property managers whom EQUITY EXPERTS engages to allow EQUITY EXPERTS to take over the property managers' collections activities, charge the collection fees that EQUITY EXPERTS's thinks it can get away with, and in exchange EQUITY EXPERTS gives those property managers as a "kick back", the principal amount of the association's debt it collects from the unit owner, monies that the unit owner was to have paid the property manager directly as annual dues or fines.

229.　Notably EQUITY EXPERTS, on its website, promotes or has promoted the benefits to property management companies that by engaging EQUITY EXPERTS, the management company will no longer need to provide the associations' collection services and hiring EQUITY EXPERTS can bring in "additional revenue for their Management Companies" "over **$1 Million**" dollars:



230. EQUITY EXPERTS, though written communication informed WALDREP that PARAMOUNT had incurred EQUITY EXPERTS's fees/costs related to collection when that statement was knowingly false or made it recklessly, without any knowledge of its truth and as a positive assertion.

231. EQUITY EXPERTS knows that its statements to WALDREP that the association "incurred" EQUITY EXPERTS's collection fees is false as a matter of law and has only been added to such communications as a paper defense in future court cases, like WALDRESP's suit here, to the arguments, evidence, and expert

reports and testimony previously advanced by the plaintiffs in *Speight et al. v. Equityexpets.org, LLC,* 2:17-cv-13663-TGB-MKM (E.D. Mich. Nov. 11, 2017).

## CLASS ALLEGATIONS

232.   The class for Count V is defined as: (1) All persons whom EQUITY EXPERTS sent any letter in the form of the letters sent to WALDREP (2) where the letter related to a condominium located in Michigan; (3) where the letter included amounts EQUITY EXPERTS added as collection fees; (4) were the letter was sent one year prior to the filing of this Complaint, and (5) where the person paid monies above an amount of the principal amount alleged to be owed to the condominium association within one year of filing this Complaint.

233.   Excluded from the class definition above are persons whom: (1) have filed a lawsuit against EQUITY EXPERTS; or (2) have entered into a written settlement agreement that would release any and all claims against EQUITY EXPERTS.

234.   On information and belief there are more than 40 persons defined in proposed class in the paragraph above.

235.   There are questions of law and fact common to each class that predominate over any questions affecting only individual class members.

236.   WALDREP will fairly and adequately protect the interests of the class he seeks to have certified as he seeks the same relief of actual damages and his claims are common and typical to the class defined herein.

237.   WALDREP has retained Curtis C. Warner, who is counsel experienced in handling class actions brought under the FDCPA and other consumer statutes, obtaining settlements deemed by courts to be fair, reasonable and adequate.

238.   The predominate questions are whether the amount of any fee associated with form letters sent by EQUITY EXPERTS was permitted by the associations bylaws, or was it "incurred" and EQUITY EXPERTS's knowing attempts to avoid liability under the FDCPA.

**WHEREFORE,** WALDREP requests this Honorable court to enter judgment against EQUITY EXPERTS on Count IV as follows:

      A.  An award of actual damages;

      B.  To certify that this matter proceed as a class action;

      C.  Appoint WALDREP as the class representative;

      D.  Appoint Mr. Warner as counsel for the class;

      E.  And award WALDREP a reasonable incentive award for serving as the class representative.

Respectfully submitted,

s/ Curtis C. Warner
Curtis C. Warner

Rachel M. Sexton (P81992)
Sexton Law PLC
30550 Gratiot Ave., Unit 66157
Tel: (734) 323-6951
rachel@sextonlawmi.com

Curtis C. Warner (P59915)
5 E. Market St. Ste. 250
Corning, NY 14830
Tel: (888) 551-8685
cwarner@warner.legal

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

s/ Curtis C. Warner
    Curtis C. Warner

Rachel M. Sexton (P81992)
Sexton Law PLC
30550 Gratiot Ave., Unit 66157
Tel: (734) 323-6951
rachel@sextonlawmi.com

Curtis C. Warner (P59915)
5 E. Market St. Ste. 250
Corning, NY 14830
Tel: (888) 551-8685
cwarner@warner.legal